**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.S., a minor by and through C.S., Guardian ad Litem<br><br>    Plaintiff,<br><br>  v.<br><br>NEWARK UNIFIED SCHOOL DISTRICT,<br><br>    Defendant.<br>_____/ | No. C 05-03241 JSW<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

This matter comes before the Court upon consideration of the motion for summary judgment filed by Plaintiff L.S. ("L.S.") and the cross-motion for summary judgment filed by Defendant Newark Unified School District ("District"). Having considered the parties' pleadings, the administrative record, and having had the benefit of oral argument, the Court DENIES L.S.'s motion and GRANTS the District's motion.

**BACKGROUND**

L.S. is a thirteen year old boy who has been diagnosed with dyslexia and dysgraphia. This dispute arises out of the District's offer to place L.S. in a special day class, with mainstreaming opportunities, for the 2004-2005 school year, and L.S.'s rejection of that offer.

**A.    Procedural Background.**

On January 11, 2005, pursuant to the Individuals with Disabilities Education Act, the District requested a due process hearing and claimed that it offered L.S. a free appropriate public

education ("FAPE") in the least restrictive environment for the 2004-2005 school year. On January 21, 2005, L.S. requested a due process hearing and claimed the District's offer for the 2004-2005 school year did not provide L.S. with a FAPE in the least restrictive environment. Those two matters were consolidated for hearing on January 27, 2005.

The consolidated due process hearing took place before the California Special Education Hearing Office over seven days in February and March 2005. L.S. and the District each presented evidence in support of their respective positions, and eighteen witnesses testified at the hearing.[1] On May 10, 2005, the Hearing Officer issued a 45-page decision. The Hearing Officer's findings pertinent to this Court's review are: (1) the manner in which the May and August IEP meetings were conducted did not seriously infringe on the parents' right to participate in the individualized education program ("IEP") formulation process; and (2) the District offered L.S. a placement in the least restrictive environment. (Decision at 15-19, 38-43.)

On August 8, 2005, L.S. initiated the present action in this Court.

**B.    Factual Background.**

During the 2003-2004 school year, L.S. attended Charles Armstrong School ("Charles Armstrong"), which caters to students with diagnosed learning differences. (Tr. 2/16/05 at 61:16-23; 2/23/05 at 50:27-52:23.)[2] According to Charles Armstrong's Head of School, Dr. Rosalie Whitlock, approximately 1% of Charles Armstrong students have IEP's with goals that

---

[1] The witnesses were: (1) Eric Burkholder, a District behavioral specialist; (2) Dr. Rosalie Whitlock, the head of Charles Armstrong School; (3) Carol Galletta, L.S.' sixth grade teacher at Charles Armstrong; (4) Jayne Fong, a District speech pathologist; (5) Gina Wilburn, a District occupational therapist; (6) Claudia Riley, a District adaptive therapist; (7) Vicki Pyper, the Newark Junior High School Special Day Class teacher; (8) Debra Kane-Nolan, a Newark Junior High School P.E. teacher; (9) Barbara Casey, the Newark Junior High School Life Skills teacher; (10) Kellene Cousins, a District psychologist; (11) Melinda Pickens, a District resource specialist; (12) Jennifer Rinna, a District psychologist; (13) Leslie Koelsch, the District Director of Special Education; (14) L.S.; (15) Vicky Wells, a behaviorist from Syngeristic Interventions; (16) Ayse Kaya, Head Teacher at New Horizons; (17) Kathryn Liu, the Principal of New Horizons; and (18) L.S.' mother.

[2] For ease of reference, in this Order, the Court cites to the Administrative Record either by reference to the transcript or by reference to a party's exhibit, and cites to the Hearing Officer's Decision by the page number in that decision, rather than the administrative record page cites.

2

need to be implemented. (*Id.* at 62:3-16.) All of the students in L.S.'s sixth grade class had learning disabilities. (*Id.* at 128:23-129:21.)

L.S. made academic progress while attending Charles Armstrong (*see id.* at 136:8-16, 138:23-139:18, 143:21-23, 146:18-147:5), but he had some behavioral issues. (*Id.* at 148:8-11, 153:19-162:6, 164:8-167:16, 172:8-20; SX 8-SX 9; SX 14; DX 5-DX 13.) In February 2004, Dr. Whitlock wrote to L.S.'s parents and informed them that she believed Charles Armstrong was not the right placement for L.S. (Tr. 2/16/05 at 66:13-25; DX 16.) In response to this letter, L.S.'s parents obtained a behavioral assessment from Synergistic Interventions. Neither L.S.'s parents nor Charles Armstrong advised the District about this assessment or about Charles Armstrong's concerns with respect to placement at that time. (*See, e.g.,* Tr. 2/28/05 at 28:13-24.) However, the record suggests that in February or March 2004, Dr. Whitlock advise Dr. Leslie Koelsch, the District's Director of Special Education, of some general behavioral issues. **(**Tr. 2/16/05 at 70:25-71:18; Tr. 2/23/05 at 26:23-28:11.)

The District held an annual IEP meeting on April 25, 2004. During this meeting, L.S.'s teacher, Carol Galletta discussed her report on L.S.'s progress. That report does not state or imply that Charles Armstrong would not accept him for the coming year. (DX 29 at 2348-2349.**)** Charles Armstrong staff also discussed L.S.'s behavioral issues at the April IEP meeting. Again, however, they did not mention that this would affect his placement at Charles Armstrong. (*See, e.g.,* Tr. 2/23/05 at 20:13-22:12; 28:9-12, 31:12-18.) As a result of these concerns, and having been presented with the Synergistic Interventions report for the first time, the IEP team agreed to conduct a behavioral assessment and continued the meeting until May 24, 2004, with the intention of completing the IEP on that date. (Tr. 2/15/05 at 122:21-122:18; Tr. 2/23/05 at 28:20-24, 33:7-25; DX 26-DX 27; DX 29 at 2333, 2351-52.)

Near the end of the May IEP meeting, Charles Armstrong told the District for the first time that it would not accept L.S. for the 2004-2005 academic year. (*See, e.g,* Tr. 2/15/05 at 188:10-24; Tr. 2/23/05 at 36:27-37:11; DX 29 at 2351; DX 36 at 2364, DX 41 at 2378.) L.S.'s mother also testified that this was the first time she knew for certain L.S. could not return to Charles Armstrong. (Tr. 2/23/05 at 36:27-37:23; Tr. 3/11/05 at 233:18-26; *see also* Tr. 2/16/06

3

79:8-87:7.) Although the District had been expecting that L.S. would return to Charles Armstrong, when it learned that he could not, the District offered to place L.S. in a special day class at Newark Junior High School. (Tr. 2/23/05 at 36:27-27:23, 38:13-40:1; DX 36; DX 41.)

Dr. Koelsch explained that she offered the special day class because, given timing issues, she wanted to get an offer on the table and because she believed the special day class was most akin to Charles Armstrong's program. She also testified that the District would have been willing to discuss the offer further. (Tr. 2/23/05 at 38:13-42:6.) Dr. Koelsch did not recall discussing a regular education placement at the May IEP meeting.

L.S.'s IEP for the 2004-2005 year reflects that the parties contemplated meeting "again in the fall before start of school to discuss mainstreaming" and that there was some discussion about L.S.'s placement for the coming year. (DX 29 at 2294, 2351). The notes summarizing the May meeting do not reflect discussions of options other than the special day class. (*Id.* at 2351-52.) Dr. Koelsch testified she wanted another meeting to discuss other options and to provide the parents with an opportunity to meet the persons that would provide services to L.S. if the District's offer was implemented. (Tr. 2/23/05 at 43:1-6.) It is undisputed that L.S. and his parents were not interested in the SDC as a possible placement and wanted to explore full inclusion in a regular education classroom. (Tr. 2/23/05 at 40:2-10; Tr. 3/11/05 at 133:16-134:4, 163:10-17; DX 43.)

On or about June 8, 2004, Dr. Koelsch sent an e-mail in which she advised she wanted to "set up an IEP meeting to discuss fall placement for L. This will be an opportunity for the parents to meet the teacher of the proposed special day class placement at NJHS," and proposed that the parties meet in July. (DX 33 at 2360). Mrs. S. acknowledged that email by letter and said she had not been able to reach counsel "regarding proposed IEP dates." (DX 35.) On July 19, 2004, counsel for L.S. wrote to counsel for the District and explained that L.S. construed the May meeting as a final offer that he intended to contest in a due process hearing. However, counsel also stated that if the District was willing to discuss alternative placements, L.S. would consider a further meeting. The District expressed its willingness to explore placements other than the special day class and agreed to provide information to L.S. and his parents in advance

4

1  of any future meeting. (DX 41, DX 42 at 2378; DX 44 at 2381; *see also* Tr. 2/23/05 at 49:17-
2  22).[3]

3   Ultimately, the District concluded that the alternative placement options it had explored
4  would not suit L.S.'s needs. (DX 44.) Dr. Koelsch discussed these options at the due process
5  hearing. She also explained that she was familiar with many of them because L.S.'s placement
6  had been an issue the previous year and she had looked into them at that time. (Tr. 2/23/05 at
7  50:15-53:27, 55:14-56:2.) Dr. Koelsch testified that many of the programs available were for
8  persons with moderate to severe needs but that L.S.'s needs were mild to moderate. She also
9  testified that distance and the age range accepted into these programs ruled many of them out as
10  viable options for L.S. (*Id.* at 158:10-160:18.)

11   L.S.'s parents initially attended the IEP meeting on August 25, 2004, but left after thirty
12  minutes. (*See, e.g.,* DX 46; SX 35) At that meeting, Dr. Koelsch stated that purpose of the was
13  to "discuss mainstreaming." (SX 35.) During the due process hearing, Dr. Koelsch stated that
14  the purpose of the August IEP meeting was to bring proposed program members into the
15  meeting so they could discuss programs fully and to provide L.S.'s parents with the opportunity
16  to present what programs they might have located. (Tr. 2/23/05 at 58:1-4.) Mrs. S. testified that
17  she came to the meeting with a binder of materials regarding over 25 possible placements that
18  she had investigated. (Tr. 3/11/05 at 166:7-25, 175:21-176:2.) However, she did not present
19  these materials before she left. (Tr. 2/23/05 at 70:10-22; Tr. 3/11/05 at 188:18-189:9.) After the
20  parents left the meeting, the remaining members of the IEP team decided to continue, discussed
21  mainstreaming and the least restrictive environment for L.S., and ultimately recommended the
22  special day class, with mainstreaming opportunities, as placement for the 2004-2005 year. (Tr.
23  2/23/05 at 70:23-73:12, 169:13-170:6.)

24   L.S.'s parents rejected the offer to place L.S. in the special day class and unilaterally
25  placed him in a an independent private school, New Horizons, for the 2004-2005 school year.
26  They advised the District of this placement via handwritten note, left with Dr. Koelsch's

---

28  [3] Mrs. S. acknowledged that these communications would have been made on the family's behalf. (Tr. 3/11/05 at 201:18-203:21, 246:16-254:10.)

5

secretary, at the August IEP meeting. (Tr. 2/23/05 at 70:23-71:4; DX 46 at 2393; DX 47.) The record establishes that L.S. visited New Horizons three times between June and August 2004 and that L.S.'s parents had paid New Horizon's tuition before the August IEP meeting. (Tr. 3/10/05 at 316:14-318:20, 322:21-323:2; Tr. 3/11/05 at 254:18-20, 257:12-21; SX 46.)

## ANALYSIS

**A.   The Individuals With Disabilities Education Act.**

Originally enacted by Congress in 1975 as the Education of the Handicapped Act, one of the purposes of the Individuals with Disabilities Education Act ("IDEA") is "to ensure that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).[4] To achieve this purpose, the IDEA "provides federal money to assist state and local agencies in educating handicapped children ... ." *Board of Educ. of the Hendrick Husdon Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179 (1982) ("*Rowley*"). In order to qualify for such funding, a state must "provide every qualified child with a FAPE that meets [substantive] federal statutory requirements." *Amanda J. v. Clark Co. Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001); *see also* 20 U.S.C. § 1412. In addition to the substantive requirements, "the IDEA also includes procedural safeguards which, if violated, may prevent a child from receiving a FAPE." *Amanda J.*, 267 F.3d at 882.

Procedurally, parents have a right to participate in the development of their child's IEP. 20 U.S.C. § 1415(b)(1); *Amanda J.*, 267 F.3d at 882. Parents also have the right pursue a complaint regarding the evaluation or educational placement of the disabled child. 20 U.S.C. § 1415(b)(6). The state educational agency conducts an "impartial due process hearing" to address complaints. *Id.* § 1415(f). If unsatisfied with the findings or decision at the hearing,

---

[4]   In July 2005, the IDEA was amended. However, as the relevant time period in question is the 2004-2005 school year, which ran from September 2004 through June 2005, the Court applies the version of the IDEA in force at that time. *See Amanda J. v. Clark Co. Sch. Dist.*, 267 F.3d 877, 882 n.1 (9th Cir. 2001).

1  either party can bring a civil action in a district court regardless of the amount in controversy. *Id*
2  § 1415(i)(2)(A).

3  Substantively, states must create an individualized education program ("IEP") tailored to
4  the unique needs of the disabled child. *Id.* § 1412(a)(4). An IEP is a written document prepared
5  annually that outlines the educational plan for the student. *Rowley*, 458 U.S. at 182; 20 U.S.C.
6  § 1414(d). The IEP should be crafted in such a way that the child's individual needs, supported
7  by services, allow the child to benefit from the education. *Rowley*, 458 U.S. at 189. States must
8  also ensure that the child has access to education in the least restrictive environment, which
9  means that a disabled child should be educated with non-disabled children, *i.e.* "mainstreamed,"
10  to the maximum extent appropriate. *Id.* at § 1412(a)(5)(A).

11  "[A] court's inquiry in suits brought under § [1415(i)(2)] is twofold. First has the State
12  complied with the procedures set forth in the Act? And second, is the individualized education
13  program developed through the Act's procedures reasonably calculated to enable the child to
14  receive educational benefits." *Rowley*, 458 U.S. at 206-07.

15  **2.     Standard of Review and Burden of Proof.**[5]

16  As the party seeking relief in this Court, Plaintiff bears the burden of demonstrating that
17  the Hearing Officer's decision should be reversed. *Clyde K. v. Pullayup Sch. Dist., No. 3*, 35
18  F.3d 1396, 1399 (9th Cir. 1994), *superseded by statute on other grounds.* If an aggrieved party
19  files a civil action after a state hearing officer's decision, a reviewing court "shall receive the
20  records of the administrative proceedings; shall hear additional evidence at the request of the
21  party; and basing its decision on the preponderance of the evidence, shall grant such relief as the
22  court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).[6]

23  The preponderance of the evidence standard "is by no means an invitation to the courts
24  to substitute their own notions of sound educational policy for those of the school authorities

---

[5]  The Ninth Circuit has explained that when an aggrieved party files a civil action under the IDEA, the use of cross-motions for summary judgment to resolve such a case is, in effect, a procedural convenience. Substantively, however, "the procedure is ... an appeal from an administrative determination." Accordingly, the Court analyzes the parties' arguments under the appropriate standards of review for IDEA cases.

[6]  Neither party has asked the Court to receive additional evidence.

which they review." *Rowley*, 458 U.S. at 206. Rather, a reviewing court accords "due weight" to the administrative proceedings. *Id.* Due weight means that "the courts are to consider the findings 'carefully and endeavor to respond to the hearing officer's resolution of each material issue,' but the court 'is free to accept or reject the findings in part or in whole.'" *Capistrano Unified Sch. Dist. v. Wartenberg ("Wartenberg")*, 59 F.3d 884, 891 (9th Cir. 1995) (quoting *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987)).

When determining what weight to give the hearing officer's findings, the Ninth Circuit has explained that it often is useful to examine the thoroughness and care of the findings. *Wartenberg*, 59 F.3d at 891. Substantial weight is given to the state hearing officer's decision "when it 'evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented.'" *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996) (citation omitted). In this case, the transcript of the due process hearing and the Hearing Officer's decision demonstrates that he carefully and impartially considered all the evidence, and each demonstrate his sensitivity to the issues presented by the parties. Accordingly, the Court shall accord substantial weight to the Hearing Officer's findings.[7]

**B.     The Hearing Officer's Decision Shall Be Upheld In Full.**

**1.     Alleged Procedural Violation.**

It is well established that procedural compliance with the IDEA, "is essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important." *Amanda J.*, 267 F.3d at 891. If a school district fails to use the proper procedures in developing an IEP, the child may have been denied a FAPE. *Id.* at 892. Although not all procedural violations will lead to the conclusion that a child was denied a FAPE, "procedural inadequacies that ... seriously infringe the parents' opportunity to participate in the IEP formulation process ... clearly result in the denial of a FAPE." *Id.* (citations omitted).

---

[7]     To the extent the Hearing Officer made credibility findings, he was in a better position than this Court is to assess the demeanor and testimony of the witnesses, and the Court shall not disturb those findings.

8

L.S. contends that because the IDEA requires "a full continuum of program options to be available to each student," if placement is discussed at an IEP meeting then the possible program options also must be addressed at that meeting. He further contends that by not discussing all such possibilities at the May and August IEP meetings, the District deprived his parents of the opportunity to participate in the IEP formulation process, because they lacked full information about what options would be suitable for L.S. (*See* Mot. at 16:8-22.) This Court finds that L.S.'s argument is not supported by the record or the law.

"The IDEA requires schools to give serious consideration to including handicapped children in the regular classroom." *Poolaw v. Bishop*, 67 F.3d 830, 835 (9th Cir. 1995). A state also "shall ensure that a continuum of alternative placements is *available* to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.551(a) (emphasis added). With respect to the IEP itself, regulations require that it include "[a]n explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in paragraph (a)(3) of this section." *Id.* § 300.347(a)(4).

At the April IEP meeting and throughout most of the May IEP meeting the parties were operating under the assumption that L.S. would return to Charles Armstrong. (*See, e.g.,* Tr. 2/23/05 at 36:27-37:11; Tr. 3/11/05 at 233:18-26.) Once it became apparent at the end of the May IEP meeting that L.S. could not return to Charles Armstrong, the record supports the Hearing Officer's finding that the parties did not discuss a continuum of placements or the least restrictive environment, although one witness testified she thought the parents posed a question about regular education. (*See, e.g.,* Tr. 2/16/05 at 210:22-213:13; Tr. 2/17/05 70:23-26, 72:7-73:19, 77:5-79:3; Tr. 2/23/05 33:7-42:6). L.S. contends that "common sense and logic" dictate that if placement is discussed, all options for placement also must be discussed and, thus, failure to discuss other options at the May IEP meeting was a procedural violation of the IDEA. However, the Court does not interpret the regulations set forth above to require *discussion* of all options, so long as alternative options are available. In this case, there is no claim that the District did not have alternative placements available or that it failed to explain the extent that

9

1  L.S. would not participate with nondisabled children in a regular class when it prepared the IEP.

2  L.S. also has not supported his position by citation to authority that is on point. Indeed, in *Katherine G. v. Kentfield School Dist.*, 261 F. Supp. 2d 1159 (N.D. Cal. 2003), on which the District relies, the defendant argued that it was not required to "adequately discuss mainstreaming opportunities with the parents" at an IEP meeting. *Id.* at 1189-90. The district court agreed and noted that it had "undertaken extensive research" to find authority to support the hearing officer's conclusion and had not found any such authority. This Court also has searched for such authority and has not found support for the proposition asserted by L.S. Thus, as the court noted in *Katherine G.*, while "it may seem intuitive that school districts should engage in such discussions at IEP meetings, the Court is not willing to read into the statute an obligation that is not expressly stated or otherwise interpreted by controlling authority to exist." *Id.* at 1190-91.

The Court also finds *W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23,* 960 F.2d 1479 (9th Cir. 1992) ("*Target Range*"), on which L.S. relies, to be distinguishable. In that case, the district prepared an IEP without input either from the parents or from the student's current school, affirmatively refused to consider suggestions from the parents about goals for the student, and also refused to continue the IEP meeting to develop an IEP in "conformity with statutory requirements." *Id.* at 1481-84. The Ninth Circuit concluded the district's actions were procedural violations that resulted in the denial of a FAPE. *Id.* at 1485.

In this case, by contrast, the record establishes that although Charles Armstrong knew it would not offer L.S. a place there 2004-2005 school year, it did not advise the District of this fact. Nor did L.S.'s parents advise the District that Charles Armstrong had concerns about L.S.'s placement. When it was first confronted with this information at the May meeting, the District made an offer based on a program that Dr. Koelsch testified she thought would be the closest program to what Charles Armstrong had offered L.S. (Tr. 2/16/05 at 87:23-88:22, 90:20-91:14, 210:22-213:13; Tr. 2/17/05 at 70:23-26, 72:7-73:19; Tr. 2/23/05 at 33:7-42:6.) As the Hearing Officer also found, however, the District was willing both to investigate and to discuss other placement options, and made efforts to schedule another IEP meeting for this

1  purpose shortly after the May meeting concluded. Thus, unlike the situation in *Target Range*,
2  the District had not adopted a "take it or leave it" position with respect to placement. *Target*
3  *Range*, 960 F.2d at 1484.

4    As it was apparent that L.S.'s parents were not satisfied by that offer, the District made
5  efforts to examine other options, including whether placement in a regular education class
6  would be appropriate, and was willing to discuss them with L.S.'s parents at a future hearing.
7  (Tr. 2/16/05 at 225:19-227:3; DX 29, DX 43-DX 45.) The record also shows that the District
8  concluded the options it had examined were not feasible but was prepared to discuss placement
9  options other than the special day class and that it did discuss such options at the August IEP
10 meeting. (Tr. 2/16/05 at 228:2-11, 244:21-245:24; Tr. 2/17/05 at 83:12-84:2, 86:12-24; Tr.
11 2/23/05 at 52:24-53:27.) However, rather than waiting to hear what the District had to say on
12 the question of placement, L.S.'s parents chose to leave the meeting before the parties had the
13 opportunity to engage in that discussion. The Court finds no fault on the District's part in
14 continuing the hearing at that point. *Cf. Shapiro v. Paradise Valley Unif. School Dist. No. 69*,
15 317 F.3d 1072, 1078 (9th Cir. 2003) (noting that school district required to include parents in
16 creation process of IEP "unless they affirmatively refused to attend"), *superseded by statute on*
17 *other grounds*.

18   Accordingly, having considered and given due weight to the Hearing Officer's findings
19 and based upon its own review of the evidence, the Court concludes that the preponderance of
20 the evidence establishes that the manner in which the May and August IEP meetings were
21 conducted did not seriously infringe parents' right to participate in the IEP formulation process.

22   **2.  Alleged Substantive Violation.**

23   With respect to the IDEA's substantive requirements, L.S. contends only that the
24 Hearing Officer erroneously determined that the special day class at Newark Junior High School
25 was the least restrictive environment. Under the IDEA, "[t]o the maximum extent appropriate,
26 children with disabilities ... are [to be] educated with children who are not disabled, and special
27 classes, separate schooling, or other removal of children with disabilities from the regular
28 educational environment occurs only when the nature of severity of the disability of the child is

such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(A). However, this preference for educating a disabled child in the least restrictive environment, commonly referred to as "mainstreaming," is not an "absolute commandment." *Poolaw*, 67 F.3d at 836. Rather, the plain language of the act requires mainstreaming "to the maximum extent appropriate." 20 U.S.C. § 1412(5)(A).

To determine whether a school district has violated section 1412(5)(A), the Ninth Circuit has established a four prong balancing test. *See Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398 (9th Cir. 1994). L.S. argues that the Hearing Officer incorrectly applied this test by looking to whether L.S. would receive "some educational benefits," rather than a satisfactory education. The Court rejects this argument. After considering each of the four factors and balancing them, it is true that the Hearing Officer did not use the term "satisfactory." However, implicit in his finding that the special day class was the least restrictive environment is the conclusion that educating L.S. "in regular classes with the use of supplementary aids and services [could not] be achieved satisfactorily." L.S. also argues that the Hearing Officer's findings on this issue are erroneous, and it is to that question that the Court now turns its attention.

When considering whether a district has offered a student a FAPE, a court's focus is on a district's proposed placement, rather than on the alternative a parent would prefer. *Gregory K.*, 811 F.2d at 1314. Under the *Rachel H.* test, to determine whether an educational placement is the least restrictive environment the court evaluates and balances: (1) the educational benefits of full-time placement in the regular classroom; (2) the non-academic benefits of such placement; (3) the effect the disabled child has on the teacher and children in the regular class; and (4) the costs of mainstreaming the child. *Rachel H.*, 14 F.3d at 1404.[8]

The Hearing Officer carefully examined and weighed each *Rachel H.* factor "by analogy" and concluded that: (1) L.S. could have received some academic benefits in a regular education classroom, but it was unlikely he would have received significant benefits because he

---

[8] Neither side addressed the issue of costs below and do not address that factor here.

12

1  functioned academically four grade levels behind and had significant social and behavior
2  deficits; (2) L.S. could have received some non-academic benefits in a regular education
3  classroom, but his significant social skill deficits would be better addressed in the special day
4  class; (3) L.S.' behavior and social skills interfered with the teacher's ability to serve her
5  classroom, his peers' learning, and his own learning, and that on balance the special day class
6  was the least restrictive environment.  (Decision at 38-43.)[9]

7  With respect to the educational benefits to L.S. of a regular education classroom, the
8  Hearing Officer's conclusions are supported by the record.  Although there was some testimony
9  that Dr. Whitlock did not believe a special day class was appropriate for him, L.S.'s teacher, Ms.
10 Galletta (who worked with him on a daily basis), did believe the special day class would be
11 appropriate.  She also told the District before the August IEP meeting that she did not see L.S.
12 being successful in a regular education class, even with an aide, and reaffirmed this opinion at
13 the due process hearing.  (Tr. 2/16/05 at 225:19-227:2; Tr. 2/18/05 at 177:12-178:3; DX 43.)  As
14 previously noted, L.S. achieved some measure of academic success at Charles Armstrong, and
15 has also shown academic achievement at New Horizons.  However, the record also establishes
16 that L.S. was functioning below his grade level.

---

[9]  L.S. argued to the Hearing Officer that both Charles Armstrong and New Horizons were regular education placements.  The record shows that District representatives did not view Charles Armstrong as a regular education classroom.  (Tr. 2/15/05 at 164:21-25; Tr. 2/23/05 at 173:7-21.)  Although the Hearing Officer did not "make a determination on whether either educational setting is a regular education classroom," because there was a dispute between the parties on this point he may have determined that using *Rachel H. "*by analogy" was appropriate because in *Rachel H.* there was a clear comparison between full inclusion in a regular education environment with part-time inclusion in that environment.

To the extent L.S. is attempting to argue that the Hearing Officer should have compared the special day class to L.S.'s classroom at New Horizons instead of a regular education classroom at L.S.'s home school, the Court finds no error.  The regulations applicable to the IDEA provide that in determining the educational placement of a disabled child, a public agency "shall ensure that ... [u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled."  34 C.F.R. § 300.552(c).  It is undisputed that if L.S. was not disabled, he would attend Newark Junior High School.  Thus, in evaluating the least restrictive environment, the Court cannot say the Hearing Officer erred by comparing a regular classroom at that public school to the special day class offered rather than comparing the special day class to L.S.'s class at New Horizons.

Both parties agree that L.S. would function best in a small class environment; yet the regular education classes at L.S. home school, Newark Junior High School, would have had approximately thirty students. (*See, e.g.,* Tr. 2/15/05 at 132:2-21; Tr. 2/23/05 at 172:18-24; DX 39 at 2334.) The special day class offered would have had ten students (six seventh graders and four eighth graders at varying levels of ability), including L.S. *(See* Tr. 2/17/05 at 138:6-8, 143:16-25, 144:16-145:13, 147:2-4; Tr. 2/23/05 at 138:25-27; DX 36 at 2366; DX 45-DX 46.) The District's placement offer did provide for mainstreaming opportunities in a Life Skills class and other electives, so that L.S. would have interacted with his non-disabled peers.

As to the non-academic benefits and the impact of L.S.'s presence in the classroom, the record supports the Hearing Officer's conclusion that the special day class was the least restrictive environment when considering L.S.'s unique needs. The record establishes that L.S.'s behavioral issues are linked with his ability to succeed academically (*see, e.g.,* DX 29 at 2322), and the District's offer of placement was designed to address that fact. It is also clear from the record that L.S. required support from his teachers both academically and behaviorally, although Ms. Galletta testified that most of her time was spent addressing behavioral issues. She also testified that she believed the behavioral issues interfered with his ability to learn because he would be removed from the classroom, and noted that in a larger classroom, the problem likely would have been worse. (*See, e.g.,* Tr. 2/16/05 at 147:19-21, 181:14-186:26, 188:25-189:12; Tr. 2/18/05 at 129:10-12.) The record also supports a conclusion that L.S.'s disruptive behavior impaired his classmates ability to learn. Finally, although all of the students in the special day class were identified as learning handicapped, the record shows that L.S. would benefit from that fact. (*See* SX 19 at 2068 (2003-2004 IEP noting that L.S. could benefit socially and behaviorally if he was not singled out as needing specialized instruction).)

Having considered the Hearing Officer's findings and having conducted its own independent review of the record in this case, the Court finds that, on balance, the *Rachel H.* factors weigh in favor of a finding that the special day class was the least restrictive environment. Accordingly, the Court finds no error in the Hearing Officer's conclusion that the District offered L.S. an FAPE in the least restrictive environment.

**CONCLUSION**

It is clear to the Court that L.S. and his parents believe that New Horizons would be a better placement for him than the special day class offered by the District. However, "[a]n 'appropriate' public education does not mean the absolutely best or 'potential-maximizing' education for the individual child." *Gregory K.*, 811 F.2d 1307 (citing *Rowley*, 458 U.S. at 197 n.21, 200). The Court concludes that the preponderance of the evidence establishes that there were no procedural or substantive violations of the IDEA and that the District offered L.S. a FAPE in the least restrictive environment. Accordingly, L.S.'s motion for summary judgment is DENIED, and the District's cross-motion is GRANTED.

**IT IS SO ORDERED.**

Dated: May 22, 2006

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE